UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| KATRINA M.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 4:20cv84 |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

2

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2022.

2. The claimant has not engaged in substantial gainful activity since May 29, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following "severe" combination of impairments: seizure disorder, migraine headaches, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no more than occasional exposure to extreme heat and cold, and hazards such as dangerous moving machinery and unprotected heights; no more than occasional exposure to loud noise as defined by the SCO.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 21, 1971 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 29, 2017, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 23-29).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on June 30, 2021.  On August 11, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on August 24, 2021.   Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Plaintiff was 46 years old as of the alleged onset date. She has an eleventh grade education. She has past relevant work as a financial services clerk and bus monitor. Plaintiff alleges problems

with epilepsy, fibromyalgia, depression, plantar fasciitis, and anxiety.

Plaintiff reported to the Disability Determination Bureau that she is often depressed, but has good days and bad days. [Tr. at 278]. Her anxiety and depression increased after she ran out of medication and had no insurance to see a doctor. *Id*. On her bad days she just stays in bed, and this can last for several days. *Id*. She takes longer to do things, due to both her physical and mental conditions. *Id*. Her left side is slower since her seizures. *Id*. She would rather stay at home than socialize. *Id*. She has constant worry, and she gets distracted very easily. *Id*. She can only sleep a couple hours due to her anxiety. *Id*. When cleaning around the house she has to take a break every ten to fifteen minutes. [Tr. at 324]. She has trouble walking through stores. *Id*. After walking for thirty to forty five minutes, her feet, ankles, and legs are severely swollen for a few hours after. *Id*. High stress situations frequently trigger a seizure. *Id*. Her short term memory is poor. *Id*.

On December 7, 2017, Plaintiff went to the emergency room after having a seizure. [Tr. at 479]. She takes Depakote and had not had a seizure since 2015. *Id*. She presented as vomiting upon arrival. *Id*. She was given IV depacon. *Id*. Her husband witnessed the seizure and reported that it lasted about ten minutes, and she was laying against the cabinets in the kitchen and began breathing deeply and convulsing. [Tr. at 480]. When the seizure finished she states she vomited and was still feeling nauseous at the hospital. *Id*. A chest x-ray was normal. [Tr. at 484].

In 2018, Plaintiff attended a psychological consultative examination by a Social Security Administration examiner. [Tr. at 495]. She reported she does not drive because she is not willing to take a chance on when another seizure might occur. [Tr. at 497]. She has difficulty with her memory. *Id*. She has fibromyalgia with resulting bodily pain. *Id*. She has significant sleep problems because her mind races. *Id*. She has anxiety and likes things kept in place and things done when

5

she asks. *Id*. Her depression began when her daughter passed away and she went through a divorce. *Id*. She was diagnosed with bipolar disorder recently and has depression with phases where she is angry with explosive outbursts, she is aggressive, and she throws things. *Id*. On the mental status examination, she did poorly on immediate memory and made errors on serial 8s and serial 3s. [Tr. at 498]. Her fund of information was average. [Tr. at 499]. Her gait is noted to be affected. *Id*. She reported having good days and bad days regarding her mood and emotional state. *Id*. She does have daily suicidal ideation, but knows not to do anything. *Id*. She cooks full meals five nights a week. *Id*. She does laundry but has difficulty cleaning as it takes her a long time because she has to stop and rest, so her daughter helps a lot. *Id*. She occasionally does some shopping with her husband. *Id*. She enjoys watching movies and reading, but is easily distracted. *Id*.

The examiner opined that Plaintiff meets criteria for bipolar disorder and generalized anxiety disorder. [Tr. at 500]. He noted she should return to therapy and be evaluated for bipolar medication. *Id*. State agency record reviewers at the initial and reconsideration levels found that Plaintiff has severe impairments including epilepsy, depressive, bipolar and related disorders, and anxiety and obsessive-compulsive disorders. [Tr. at 161, 175]. Her mental impairments were considered under listings 12.04 and 12.06, and under the "B" criteria it was opined she has only mild limitations in the ability to concentrate, persist, or maintain pace. [Tr. at 162, 175]. It was opined she has the residual functional capacity (RFC) to lift and/or carry fifty pounds occasionally and twenty five pounds frequently. [Tr. at 163, 177]. She can stand and/or walk for a total of about six hours in an eight hour workday and sit for a total of about six hours in an eight hour workday. [Tr. at 164, 177]. She can occasionally climb ramps and stairs; never climb ladders,

6

ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. [Tr. at 164, 178]. She should avoid concentrated exposure to extreme cold and heat, and avoid even moderate exposure to hazards such as machinery and unprotected heights. [Tr. at 165, 178-179].

Plaintiff saw Dr. Ungar-Sargon, a pain management specialist, for evaluation of her lower back and left shoulder pain. [Tr. at 537, 544]. She described the pain as gradual in onset, occurs constantly, lasts all day long, and has been fluctuating over time. *Id*. Her pain ranges from mild to severe on some days. *Id*. It is characterized as aching, dull, sharp, shooting, sore, stiffness, tender, and throbbing. *Id*. Her pain radiates to the left arm, left thigh, left knee, left leg, left calf, left ankle, left foot, and all toes of her left foot. *Id*. She rates it as 6/10 in severity without pain medications. *Id*. It gets worse with weather changes, during sleep, when doing housework, after seizures, standing, walking, and climbing up and down stairs. *Id*. She has associated Charlie horses, back pain, cramps, decreased mobility, difficulty in ambulation, irritability, joint pain, joint stiffness, joint swelling, limited range of motion, locking, muscle spasms, muscle stiffness, muscle tension, and night pain. *Id*. Relieving factors include changing position, rest, and hot showers. *Id*.

Plaintiff takes no pain medications, but has tried Tylenol, ibuprofen, naproxen sodium, Cymbalta, and Lyrica in the past, all with no improvement. She has also tried heat therapy, cold therapy, over the counter nonsteroidal anti-inflammatories, and topical creams, all of which were not effective. *Id*. She has difficulty falling and staying asleep, and her quality of sleep is terrible. *Id*. Her left shoulder pain persists despite therapy. *Id*. She presented complaining of cervicalgia, cervicobrachial syndrome, and cervicocranial syndrome. *Id*. She also reported having migraine headaches. [Tr. at 538, 545]. She has headaches nearly every day that she rates at 5-6/10 in severity on average. [Tr. at 539, 546]. The pain usually begins in the back of her head or neck and

7

radiates to the front of her head above her eyes, and around the head in a halo. *Id*. The pain is throbbing/stabbing. *Id*. She also gets migraines with photophobia and phonophobia. *Id*. An EEG was performed which was deemed markedly abnormal and consistent with a seizure disorder. [Tr. at 547]. A nerve conduction study revealed no response in the right peroneal sensory nerve. [Tr. at 557]. An EMG did not reveal any obvious de-nervation with normal peripheral nerve integrity. [Tr. at 554].

On examination, Plaintiff was 5'5" tall, weighed 279 pounds, and had a body mass index (BMI) of 46.42. [Tr. at 540, 547]. On examination, there was tenderness on both sides of the paravertebral muscles in the cervical spine. [Tr. at 540, 548]. The left shoulder movements were restricted with adduction, limited to five degrees. *Id*. Hawkins test, lift-off test, and speeds test were positive. *Id*. On palpation, tenderness was noted in the acromioclavicular joint. *Id*. The thoracic spine revealed mild scoliosis and tenderness of the paravertebral muscles. *Id*. Inspection of the lumbar spine revealed asymmetry; range of motion was restricted with flexion and extension; tenderness in the left paravertebral muscles; tight muscle band; Gaenslen's test, lumbar facet loading, straight leg raising test, FABER test, and pelvic compression test were all positive; and internal rotation of the femur resulted in deep buttocks pain. *Id*. Hip examination revealed joint asymmetry; Gaenslen's, FABER tests, Trendelenburg's test, compression test, distraction test, and high thrust test were all positive. *Id*. There was reduced strength in the upper left proximal muscle. *Id*. There was loss of all modality in the lower extremities and there was increased sensation to touch to the posterior aspect of the left lower extremity calf area. *Id*. Plaintiff was assessed as having epilepsy, radiculopathy in the cervical and lumbar region; pain in the left leg; bicipital tendinitis in the left shoulder; and fibromyalgia. [Tr. at 541, 548]. She was

prescribed Ultram for pain as well as orthopedic bracing TENS unit, physical therapy, and hot/cold packs. [Tr. at 543, 550].

Dr. Ungar-Sargon completed a fibromyalgia RFC questionnaire regarding his treatment of Plaintiff on a monthly basis for two years. [Tr. at 561]. Her prognosis was considered poor. *Id*. Her symptoms included multiple tender points, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, numbness and tingling, and anxiety. *Id*. She had emotional factors that contribute to the severity of her symptoms and functional limitations. *Id*. She had pain in the bilateral cervical and thoracic spine, shoulders, and hips. [Tr. at 562]. Her pain was described as chronic, nagging, and aching. *Id*. Changing weather, fatigue, and movement or overuse precipitate her pain. *Id*. She frequently experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. [Tr. at 563]. She is incapable of even "low stress" jobs. *Id*. She could walk less than one city block without rest or severe pain. *Id*. She could sit for fifteen minutes at one time, for a total of less than two hours in an eight hour workday. *Id*. She could stand for ten minutes at one time, while standing and walking a total of less than two hours in an eight hour workday. *Id*. She would need a job that permits shifting positions at will from sitting, standing, or walking. [Tr. at 564]. She should use a cane or other assistive device while engaging in occasional standing or walking. *Id*. She would need to take unscheduled breaks of ten minutes every hour to sit quietly during an eight hour workday. *Id*. She could rarely lift less than ten pounds. *Id*. She could rarely twist, stoop, and crouch. [Tr. at 565]. She could never climb ladders or stairs. *Id*. She could occasionally look down, look up, turn her head left or right, and hold her head in a static position. *Id*. She could use her bilateral hands for grasping, turning and twisting objects 80% of the time; her fingers for fine

9

manipulations 90% of the time; and her arms for reaching 40% of the time. *Id*. Her impairments were likely to produce both good and bad days, and she is likely to be absent from work more than four days per month as a result of the impairments or treatment. *Id*.

At the hearing, Plaintiff's attorney stated that Plaintiff suffers seizures that interfere with her ability to sustain work. [Tr. at 46]. Despite being under fair control for a while, she began suffering one seizure a month in the months just prior to the hearing. *Id*. She also suffers pain from fibromyalgia and migraines. [Tr. at 47]. Her obesity complicates her pain. *Id*. She has nerve problems demonstrated on EMG, an abnormal EEG, and she suffers depression and anxiety. *Id*.

Plaintiff testified that she was uninsured for a long time and did not receive medical treatment during that period. [Tr. at 47]. She stated that she has a lot of memory loss due to her seizures. [Tr. at 48]. She does not drive due to her fear of having a seizure with her grandchildren in the vehicle. *Id*. She stopped working because it was getting hard for her to stand for five to six hours as a cashier, and the sciatica in her left leg makes her limp. [Tr. at 49]. She worked five to six hour shifts, and by the fourth hour she was struggling to stay on her feet. [Tr. at 51]. At the time of the hearing she testified she is only able to stand about thirty minutes before she needs to sit down because of shooting pain in her left leg. [Tr. at 52]. She is able to sit for more than thirty minutes with a lot of shifting around in the chair. *Id*. She can walk for about a block and a half, and tries to push herself because her doctors want her to walk, but the next day she hurts. [Tr. at 53]. She has difficulty climbing stairs, and has to take one at a time and hold on to something for fear she will fall. *Id*. Her daughter does the laundry because the machines are in the basement and she does not go down those stairs. [Tr. at 54]. It takes her twice as long to do dishes because her back hurts, so she has to take breaks to sit on the couch before she can get up and finish the chore.

[Tr. at 55]. She takes Tramadol for the pain, which helps some but does not take the pain away completely. *Id*. She also uses BioFreeze or Aspercreme to try to alleviate the pain. *Id*. She testified that Dr. Ungar-Sargon has recommended physical therapy and a brain implant to control her seizures. [Tr. at 56]. Her last seizure was just nine days prior to the hearing, and she had six in one day. *Id*. She does not know when she is going to have a seizure, and has no memory of having had a seizure. [Tr. at 57, 60]. She had been seizure free from December 2017 until March 2019. [Tr. at 58]. Dr. Ungar-Sargon had recently changed her medication for seizures, adding Keppra to her Depakote regimen. [Tr. at 60]. After a seizure, it takes her about two days to recover because she gets sick and very tired and unable to function. [Tr. at 61]. She has some side effects from her medications including shaking and weight gain. *Id*. The addition of Keppra, however, has made her lose weight. *Id*. She has two grandchildren living with her, ages 11 and 8, and she makes sure they get to school. [Tr. at 63]. She makes sure they are ready, and her husband drives them if he has to, otherwise one walks and the other is picked up by a special needs bus. [Tr. at 63-64]. She has headaches every day, and migraines two to three times a month. [Tr. at 64]. When she has a migraine she has to be in a completely dark room with something over her eyes for two to three hours. *Id*. She has severe depression and recently tried to kill herself. [Tr. at 65]. Her doctor increased her Cymbalta dosage at that time, but she still has symptoms of depression. *Id*. She does not have the suicidal thoughts anymore though. [Tr. at 66]. She stated her concentration is a little better, but she has good days and bad days. *Id*. On bad days she does not want to function or get out of bed. *Id*. These occur a couple times a week. *Id*. She has crying spells daily. *Id*.

The ALJ asked the vocational expert (VE) to consider an individual of Plaintiff's age, education, and work experience. [Tr. at 67]. In the first hypothetical, the ALJ asked the VE to

assume this individual can perform light work except occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and no more than occasional exposure to extreme heat and cold, hazards such as dangerous moving machinery and heights, and loud noise. [Tr. at 69]. The VE testified this hypothetical would allow for the past work as a cashier, but not as a server. *Id*. The ALJ noted that with past work at a composite job, if you cannot perform all parts of the job then you cannot perform the job. *Id*. The VE testified that in that sense, the individual cannot perform the past relevant work, but can perform other jobs such as furniture rental consultant, marking clerk, or storage facility rental clerk. [Tr. at 70].

The ALJ then asked the VE to assume the first hypothetical and add that the individual can perform simple tasks; understand, remember, and carry out simple tasks; make simple work-related decisions; deal with occasional changes in work process and environment; can have incidental, superficial work-related contact with coworkers, supervisors and the general public which is defined as brief, succinct, concise, cursory communication for all the tasks being performed. [Tr. at 70-71]. The VE testified this individual could not perform the previous jobs cited, nor any other work in the national economy due to the limitation to brief and superficial social interaction. [Tr. at 71].

The ALJ then changed the second hypothetical so that the individual can understand, remember, and carry out simple tasks; make simple work-related decisions; deal with occasional changes in work process and environment; and can have occasional interaction with coworkers, supervisors and the general public. *Id*. The VE testified that this individual could perform work as marking clerk, routing clerk, or housekeeping/cleaner. [Tr. at 71-72]. The VE testified that a

12

person can miss at most one day of work per month. [Tr. at 73]. If an individual requires additional unscheduled breaks of up to fifteen minutes each day, this would not be tolerated. *Id*. The ALJ then asked the VE to assume an individual capable of sedentary work except occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no more than occasional exposure to extreme heat and cold, hazards such as dangerous moving machinery and heights, and loud noise; can understand, remember, and carry out simple tasks; make simple work-related decisions; deal with occasional changes in work process and environment; and can have occasional interaction with coworkers, supervisors and the general public. [Tr. at 74-75]. The VE testified this individual could perform work as a document preparer, surveillance system monitor, or addresser. [Tr. at 75]. These jobs would still be available if the individual could have no work with the general public. *Id*. They would also still be available if the individual were limited to occasional overhead reaching with the bilateral upper extremities. [Tr. at 75-76].

In support of remand, Plaintiff first argues that the ALJ erred in her evaluation of Plaintiff's symptoms. The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 CFR §416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities. . ." *Id.*

13

Here, the ALJ concluded that Plaintiff is capable of performing light work except she can only occasionally climb ramps or stairs; no climbing ladders, ropes, or scaffolds; can only occasionally balance, stoop, kneel, crawl and crouch; no more than occasional exposure to extreme heat and cold, hazardous machinery and unprotected heights; and no more than occasional exposure to loud noise. [Tr. at 25]. The ALJ then states, "[i]n making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." *Id*. The ALJ later notes that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence of record for the reasons explained in the decision. [Tr. at 26].

The ALJ briefly summarized Plaintiff's testimony and selective parts of the medical record. Plaintiff points out that nearly every reason the ALJ gives to discount Plaintiff's allegations of difficulties from her impairments relates back to one emergency room record. The ALJ consistently referred to Exhibit 5F, the emergency room record, to disprove Plaintiff's allegations of seizures and migraines due to normal examination findings such as no musculoskeletal tenderness, full range of motion in all extremities, no peripheral edema, no neurological deficits, denial of headaches, and normal psychiatric exam. [Tr. at 26]. Plaintiff contends that the ALJ's reliance on the one time emergency room visit record is misplaced. On December 7, 2017, Plaintiff arrived at the emergency room at 3:00 am after having a seizure and was discharged two hours later. [Tr. at 479]. She was vomiting upon arrival, had a chest x-ray, and remained in bed receiving an IV of depacon. *Id*. Barely eleven minutes had passed since her arrival when the emergency

14

room doctor had entered his physical examination findings. [Tr. at 482]. Plaintiff argues that it is not likely that an extremely thorough physical examination was conducted when the priorities after a seizure included checking for head injuries and eye reactivity which were typed in bold in the doctor's notes. *Id*. Plaintiff argues that this one time emergency triage examination does not outweigh the specific and thorough physical examinations performed by the treating neurologist thirteen months later.

With respect to Plaintiff's allegations of daily headaches, the ALJ pointed to Plaintiff's statements in her function report to the Social Security Administration that she is able to finish what she starts, gets along with others, can go out alone and shop at the store, has no problems with personal care, and can prepare complete meals. [Tr. at 27]. Plaintiff points out that the ALJ did not explain why these normal activities of daily living negate the presence of migraines and headaches. Plaintiff notes that she has never alleged that her daily headaches keep her bedridden and altogether non-functioning.

Plaintiff notes that the Seventh Circuit has repeatedly cautioned against equating the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). In *Bjornson*, the Court noted that the critical difference between daily living activities and activities of a full-time job is that in the former the person has more flexibility in scheduling, can get help from others when needed, and is not held to a minimum standard of performance. *Id*

In evaluating the claimant's subjective symptoms, "an ALJ must consider several factors,

15

including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 CFR §404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's subjective symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support the claimant's subjective symptoms. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003).

SSR 16-3p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." SSR 16-3p, at *4; *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). The Seventh Circuit has stated ". . . we cannot uphold an administrative decision that fails to mention highly pertinent evidence, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009) (per curiam), or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.2009); *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir.2007)." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

In response to the Plaintiff's arguments, the Commissioner mischaracterizes Plaintiff's contention regarding the ALJ's application of SSR 16-3p. The Commissioner fails to address the

16

argument that the ALJ placed undue reliance on one specific treating source visit, instead merely noting that the December 2017 record was "from the relevant period." It is clear from the record and decision that the ALJ placed great emphasis on this single record, to the detriment of the remainder of the evidence. "[ALJs] are not free to disregard uncontradicted medical opinions." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Accordingly, remand is warranted to allow for proper consideration of the full record, thereby allowing a fuller and more in-depth analysis of Plaintiff's subjective symptoms, as required by the regulations.

     Next, Plaintiff argues that the ALJ improperly evaluated Dr. Ungar-Sargon's opinion. At step two, the ALJ found that Plaintiff has severe impairments of seizure disorder, migraine headaches, and obesity. [Tr. at 23]. She then found that Plaintiff has nonsevere impairments of plantar fasciitis, hypertension, depression, and anxiety. [Tr. at 23-24]. She also concluded that fibromyalgia is not a medically determinable impairment. [Tr. at 24]. Plaintiff argues that the ALJ never provided an analysis of Plaintiff's cervical and lumbar radiculopathy or bicipital tendinitis in the left shoulder that were later diagnosed by Dr. Ungar-Sargon. [Tr. at 541, 548]. Plaintiff further argues that the ALJ never explained at step two why these impairments were not considered medically determinable impairments, let alone why they were not considered severe impairments.

     At step two, it is Plaintiff's burden to establish a medically determinable impairment. *See Bowen v. Yuckert*, 482 U.S. 137 (1987) (citing 42 U.S.C. § 423(d)(5)(A)). Here, Dr. Ungar-Sargon performed two thorough physical examinations documenting pain and limitations throughout Plaintiff's spine, left lower extremity, and left shoulder, as detailed above.

     The ALJ failed to address this evidence at step two and dismissed Dr. Ungar-Sargon's medical opinions.[Tr. at 28]. *Id*. Plaintiff contends that the ALJ is not trained to make a

17

determination regarding the validity of medical diagnoses, and has impermissibly played doctor by substituting her own opinion for that of the trained medical professional who ran an abundance of specific tests to determine medical diagnosis. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990); *Easter v. Bowen*, 867 F.2d 1128, 1131 (8th Cir. 1989).

In *Craig v. Apfel*, 10 F. Supp.2d 966, 968-69 (N.D. Ill. 1998), the Court noted that an ALJ is not allowed to make independent medical findings within the course of his or her rationale. *Id*., citing *Herron v. Shalala*, 19 F.3d 329, 334 n.10 (7th Cir. 1994). The Court pointed out that the Seventh Circuit "has counseled on many occasions [that] ALJs must not succumb to the temptation to play doctor and make their own decisions." *Id*., citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Furthermore, the Court found that the ALJ's questioning attack on the medical expert's testing methods because they were based on the claimant's subjective complaints, was "another forbidden foray into an expert's field of specialty," substituting lay judgment for that of an expert. *Id*., citing *Rohan*, 98 F.3d at 969; *Scivally*, 966 F.2d 1076 (7th Cir. 1992).

The ALJ is not permitted to make his own independent medical determinations about the claimant's condition. When no contradictory medical evidence exists, and the ALJ rejects a medical opinion, the ALJ impermissibly substitutes his own medical judgment for that of the experts. *Scivally v. Sullivan*, 966 F.2d 1070, 1076-77 (7th Cir. 1992). *See also Campbell v. Chater*, 932 F. Supp. 1072, 1079 (N.D. Ill. 1996) (noting that an ALJ cannot properly make an independent medical determination when there is no supporting expert testimony on the record).

The also ALJ found the prior administrative findings by the state agency medical physicians to be somewhat persuasive, but added more limitations based on newer evidence in the record.

18

The ALJ then found the opinion of Dr. Ungar-Sargon to be not persuasive. [Tr. at 27]. The ALJ found the opinion to be supported by the objective evidence in his own records, but found it was not consistent with "all the other evidence in the record from all other sources." *Id*. However, Plaintiff points out that prior to Dr. Ungar-Sargon's January and February 2019 visits, Plaintiff had not been seen by a regular treating physician[2], and had only been to the emergency room in December 2017 for a seizure. [Tr. at 479]. The ALJ held that there was no diagnostic imaging to support the diagnosis, and referred to an EMG of the lower extremities that does not show obvious de-nervation and normal peripheral nerve integrity. [Tr. at 28]. However, the ALJ ignored the nerve conduction study that revealed no response in the right peroneal sensory nerve. [Tr. at 557]. "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018); citing *Campbell v. Astrue*, 627 F.3d 299, 301 (7th Cir. 2010).

Plaintiff further points out that the ALJ relied on the findings in Dr. Ungar-Sargon's treatment notes, which were the basis for the doctor's RFC assessment and medical opinion, to support her limitation to light work with additional postural and environmental limitations. [Tr. at 26]. Plaintiff argues that the ALJ has improperly rejected Dr. Ungar-Sargon's opinion for one purpose and relied on it for another, inconsistent purpose. *Mazzuca v. Colvin*, No. 12 C 2907, 2013 U.S. Dist. LEXIS 47400, 2013 WL 1343344, at *9 (N.D. Ill. Apr. 2, 2013) ("An ALJ cannot logically reject a treating physician's report and then rely on it to support the RFC finding.").

---

[2] Plaintiff reported that she often did not have medical insurance and thus was unable to receive proper treatment.

19

In response, the Commissioner relies heavily on the lack of diagnostic imaging to explain why the ALJ could disregard the opinion of Dr. Ungar-Sargon. However, it is clear that the ALJ failed to properly consider the medical evaluation of Plaintiff by Dr. Ungar-Sargon. [Tr. at 540, 548]. The ALJ impermissibly determined that Dr. Ungar-Sargon's medical diagnoses were invalid, when only a trained medical expert can make that kind of determination. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *Easter v. Bowen*, 867 F.2d 1128, 1131 (8th Cir. 1989). Accordingly, remand is necessary for proper consideration of Plaintiff's cervical and lumbar radiculopathy, left shoulder tendinitis, and Dr. Ungar-Sargon's medical opinions.

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED.

Entered: September 13, 2021.

                                                    s/ William C. Lee
                                                    William C. Lee, Judge
                                                    United States District Court